IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2022

## STATE OF TENNESSEE VS. MUSTAFAH BRUMMELL

**Appeal from the Criminal Court for Davidson County
No. 2019-C-1748    Angelita Blackshear Dalton, Judge**

_____

**No. M2022-00383-CCA-R3-CD**

_____

A Davidson County jury convicted the Defendant-Appellant, Mustafah Brummell, of two counts of aggravated robbery, for which he received an effective sentence of twenty-eight years' imprisonment. On appeal, the sole issue presented for our review is whether the evidence is sufficient to support his convictions. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Jay Allen Umerley, Nashville, Tennessee, for the Defendant-Appellant, Mustafah Brummell.

Jonathan Skrmetti, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeffrey Jackson, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

On February 28, 2019, between 8:30 and 9 o'clock in the evening, Yonardo Pedro Carmelo and his girlfriend, Rosa Adela Mina, were robbed at gunpoint in the parking lot of their apartment home in Nashville, Tennessee. Carmelo testified that they were returning home from shopping, parked at their apartment, and began to get out of the car. As Carmelo picked up the bags from the back door of the car, he turned around and saw a person pointing a gun at him. Carmelo said the person ordered him to "put [his] phone and [his] wallet on the floor[.]" Carmelo initially believed it was a joke and did not comply. The perpetrator then yelled louder, "Put your wallet and your phone on the floor or I'm going to shoot you[!]" The perpetrator continued and said, "I'm going to count to five and if you don't put your phone and your wallet on the floor[,] I'm going to shoot you[!]"

Carmelo complied. At this point, the perpetrator realized Mina was also getting out of the car. Mina saw Carmelo was being held at gunpoint, and she attempted to call 911 on her phone. She testified that the perpetrator saw her, took her phone, and tried to cancel the 911 call. She said he "was clicking on [her] phone," and then ordered her to put her purse on the ground. She said he took their belongings and began to back away from them while simultaneously holding the gun on them. Both victims testified that the perpetrator took their iPhones, money, purse, and wallet and then got into the front passenger seat of a white car which sped away. Both victims testified they were fearful during the offense and did not give the perpetrator consent to take their belongings. Neither victim had ever seen the perpetrator prior to the offense. The victims then went to a friend's apartment and borrowed his or her phone to call the police.

Within five minutes of the offense, Officer William King with the Metro Nashville Police Department (MNPD) arrived, interviewed the victims, and began to search for their belongings. By using the Find My iPhone feature application, both iPhones were located within 20 to 25 minutes. Mina's phone, which she had owned for about three years prior to the offense, was located within 50 to 70 feet of the apartment. Carmelo's phone was found within 200 feet of the apartment and was "all broken" when recovered. Each victim identified where the phones were located on a map that was admitted as an exhibit at trial. Carmelo was shown a photograph, marked for identification, and agreed that it depicted a gun and a red bandana that were similar to the ones used by the perpetrator during the robbery. He said the perpetrator was dressed in all black, had a hat, and a handkerchief covering his face. Carmelo described the perpetrator as a tall, Black male, somewhat thin, and around 20 to 23 years old. Carmelo described the gun as a long, "military style weapon" with a laser light that was pointed at his chest.

MNPD Officer King testified that he responded to a robbery call on the day of the offense. He spoke with both victims, who advised him they had been robbed at gunpoint and the perpetrator had stolen their cellular phones. He confirmed that they located the phones shortly thereafter by using the iPhone application, and he identified where the phones were recovered on a map which was admitted as an exhibit. He explained the process used to extract fingerprints from evidence, which was performed on both phones. He then identified the fingerprint cards he submitted to the property room for further analysis, and they were admitted as an exhibit at trial. He testified that he sealed both phones in an envelope for fingerprint analysis, took them to the station, and placed them in the property drop box. On cross-examination, he did not recall how many fingerprints were lifted from the phones; however, he stated that there were three cards worth of fingerprints.

Jacqueline Cockrill, an expert in the field of fingerprint analysis and latent examination, testified that she had been conducting fingerprint analysis since 2004. She confirmed that she examined the latent fingerprint cards identified by Officer King. From

her examination, she compiled a report which was admitted as an exhibit at trial. Based on the report, she explained that fingerprints were lifted from the front and back of Mina's[1] iPhone and the front of Carmelo's iPhone. No fingerprints of value were found on Carmelo's phone or the back of Mina's phone. She determined that the latent prints recovered from the front of Mina's iPhone matched Defendant's known thumbprint, which she obtained from the Automated Fingerprint Identification System or AFIS. Cockrill concluded that the fingerprint matched Defendant's print, and her findings were verified by two different latent print examiners.

MNPD Detective Trevor Vondohlen testified that he investigated the instant case. Once Detective Vondohlen received confirmation from the crime lab that the fingerprint from Mina's phone matched the Defendant, he sent in a "282 form," which was a request for another examination of the fingerprints under a different methodology to confirm that the fingerprints were in fact the Defendant's. He then spoke with the victims and verified that they did not know the Defendant and that the Defendant had no reason to be in possession of Mina's phone. The Defendant was arrested on April 16, 2019, denied any involvement in the instant offense, and he could not provide an explanation for why his fingerprint was on Mina's phone. The Defendant admitted to recent possession of an AR-15 rifle. Detective Vondohlen obtained a search warrant and examined the contents of the Defendant's phone. He recovered two photographs showing the Defendant holding an AR-15 and wearing a red bandana, which were admitted as an exhibit. These photographs were the same photographs previously shown to Carmelo, who said the weapon and bandana were similar to the ones used by the perpetrator of the offense. A text exchange was also recovered from the Defendant's phone and admitted into evidence. The text messages showed that on March 17, 2019, a few weeks after the instant offense, an individual asked the Defendant, "You still got the AR[?]" The Defendant replied, "Yeah, why, wussup." The other individual said, "Man, I need that hoe." The Defendant then replied, "It's put up, like I still got access to it, but it's hot rn." Detective Vondohlen conducted a search of the Defendant's residence and recovered a red bandana from the Defendant's bedroom closet, which was admitted as an exhibit.

Detective Vondohlen said that the weapon used in the offense was not recovered, nor did he recover an AR-15 from the Defendant's residence. Detective Vondohlen confirmed that the victims were unable to identify the perpetrator of the offense from a photographic array, due to the fact that the perpetrator wore a bandana covering his face. On cross-examination, he denied telling the victims to describe the weapon used by the perpetrator as "military style." He said that was how the victims described the weapon upon being asked. He agreed that the bandana and weapon in the photographs were

---

[1] The fingerprint examination report identifies the phone as belonging to "Rosa Adela," and we presume this refers to the victim, Rosa Mina, as her full name listed in the indictment is Rosa Adela Mina.

"common" in this country. Detective Vondohlen also agreed that the Defendant had no obligation to provide an explanation for his fingerprint on Mina's phone to police. On redirect, Detective Vondohlen clarified that the Defendant was <u>Mirandized</u>, waived his rights, and voluntarily spoke with him about this case.

The Defendant did not offer any proof at trial, and the jury convicted him as charged in the indictment of two counts of aggravated robbery. Following a sentencing hearing, the trial court imposed a sentence of fourteen years for each offense, to be served consecutively, for an effective sentence of twenty-eight years' imprisonment. The Defendant filed an unsuccessful motion for a new trial and a subsequent notice of appeal. This case is now properly before this court for review.

## ANALYSIS

The Defendant argues the evidence was insufficient to support his convictions of aggravated robbery. In response, the State contends, and we agree, that the evidence was more than sufficient to support his convictions. Upon review of a challenge to the sufficiency of the convicting evidence, we apply the following well-established legal framework. "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009) (citing <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>State v. Wagner</u>, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)); <u>see</u> Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. <u>State v. Davis</u>, 354 S.W.3d 718, 729 (Tenn. 2011) (citing <u>State v. Majors</u>, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. <u>State v. Sutton</u>, 166 S.W.3d 686, 691 (Tenn. 2005); <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>Hanson</u>, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. <u>State v. Campbell</u>, 245 S.W.3d 331, 335 (Tenn. 2008) (citing <u>Byrge v. State</u>, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover,

the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

To sustain a conviction of aggravated robbery as charged in this case, the State was required to establish that the Defendant committed a robbery as defined in Tennessee Code Annotated section 39-13-401, that was accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. Tenn. Code Ann. § 39-13-402 (a)(1). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a).

The Defendant does not challenge the elements of aggravated robbery, nor does he contest that an aggravated robbery occurred in this case. Instead, the Defendant suggests that there was insufficient evidence to establish that he was the perpetrator of the aggravated robbery. It is well established that the identity of the perpetrator is an essential element of any crime. State v. Miller, 638 S.W.3d 136, 158 (Tenn. 2021); State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Viewed in the light most favorable to the State, the proof at trial established that Carmelo and Mina were robbed by an individual who wore a red bandana and brandished a military style weapon at them while demanding their belongings. During the robbery, Mina attempted to call 911. The perpetrator grabbed Mina's phone and was clicking on it trying to cancel the call. The perpetrator then took the victims' belongings, including both phones. Although the victims were unable to identify the perpetrator from a photographic array, they described him as a tall, slim, Black male in his early twenties. The victims' phones were recovered within 20 minutes of the offense, and Mina's phone had the Defendant's thumbprint on it. The fingerprint expert testified that two other fingerprint analysts reviewed and confirmed her report. Detective Vonholden also had the fingerprint analyzed under another methodology to confirm that it matched the Defendant. The

victims did not know the Defendant prior to the offense, and there was no reason for his fingerprint to have been on Mina's phone. This court has previously stated that "'[f]ingerprint evidence alone may support a conviction and the weight to be given to such evidence is for the jury's determination.'" See State v. Richmond, 7 S.W.3d 90, 92 (Tenn. Crim. App. 1999) (quoting State v. Evans, 669 S.W.2d 708, 710 (Tenn. Crim. App. 1984)). In addition, a few weeks after the offense, the Defendant had a text exchange confirming access to an "AR" and that it was "hot" right now. Upon searching the Defendant's phone, photographs of the Defendant show him in possession of a military style weapon and wearing a red bandana. Carmelo confirmed that it was similar to the bandana and weapon used by the perpetrator. On this evidence, any rational trier of fact could have found that the Defendant was the perpetrator of the aggravated robbery beyond a reasonable doubt. The Defendant is not entitled to relief.

## CONCLUSION

Based on the above analysis and authority, we affirm the judgments of the trial court.

_____

CAMILLE R. MCMULLEN, JUDGE